UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| SARAH HASKINS ET AL | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 07-9347 |
| | * | |
| OFFSHORE SERVICE VESSELS, LLC ET AL | * | SECTION "L" (4) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.    BACKGROUND & PROCEDURAL HISTORY**

This is a wrongful death and survival action brought under the Jones Act and General Maritime Law by Sarah Haskins arising out of the death of her husband, Michael Haskins. Prior to his death Michael Haskins was employed by the Defendant, Offshore Service Vessels, LLC as a vessel engineer. Beginning in May of 2005 the Defendant deployed Haskins to work aboard its vessels operating in the territorial waters off the coast of Nigeria. After completing his shift on December 5, 2006 he returned to his home in North Carolina. A day or so later he developed fever and went to his family doctor in his home town. He thereafter received treatment from several doctors and medical facilities. He died eight days later on December 13, 2006 of malaria.

The Plaintiff alleges that the Defendant's negligence proximately caused Michael Haskins death and seeks an award for pecuniary damages and pre terminal pain and suffering. Specifically, the Plaintiff claims that the Defendant failed to adequately educate, train and

1

instruct Haskins on malaria prevention and the signs and symptoms of malaria while working in Nigeria.  Further, according to Plaintiff, the Defendant did not inform Mr. Haskins on the type of information to impart to a treating physician if falling ill shortly after returning from a tour of duty.

The Defendant denies liability and contends that the nature and scope of the malaria education provided by the defendant to Haskins was adequate.  Further, the Defendant argues that Haskins was himself negligent in failing to take preventive medication.

This matter came on for bench trial on May 24, and 25, 2010.  The Court, after having carefully considered the testimony of all witnesses, the exhibits entered at trial, and the record, hereby enters its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  To the extent any finding of fact constitutes a conclusion of law, the Court adopts it as such and to the extent any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.  FINDINGS OF FACT

(1)

On or about November 18, 2004 Michael Haskins was hired by the Defendant, Offshore Service Vessels, LLC (OSV) as a vessel engineer.  Ex. A-1.  He was initially assigned to the BJ DISCOVERY, an offshore supply vessel owned and/or operated by OSV, for service in the Gulf of Mexico within the territorial waters of the United States. Ex. J.

(2)

In approximately May of 2005, OSV redeployed Haskins to work in the territorial waters of Nigeria in sub-Saharan West Africa.  OSV had contracted with Exxon Mobil Corp. and

Chevron USA to provide supply vessels for their offshore operations. Haskins was to travel by OSV vessel (the C-Tractor II) from Port Fourchon, Louisiana to Onne Port, Nigeria. Ex. J.

(3)

Prior to his departure, on May 18, 2005, Haskins received booster immunizations from Dr. Robert W. Davis at Occupational Medicine Services, LLC (OMS) Clinic in Houma, Louisiana. Ex.U-14. At the time Dr. Davis served as OSV's medical director. Dr. Davis does not remember the specifics of his conversation with Haskins and his chart which recorded Haskins visit does not reference malaria. However, according to his office protocol and usual practice Dr. Davis stated that he is confident that he would have told Haskins that malaria is a common disease in Nigeria, explained the symptoms to look out for, the medicine to take, and the importance of going to a doctor if he became ill. 4/28/10 Davis Dep. at 23:5 - 24:3.

(4)

Haskins received another briefing regarding malaria prior to the vessel's departure from Port Fourchon by Brent Chaisson, a member of OSV's management who conducted a pre-voyage briefing for the vessel's crew which included Haskins. Chaisson advised about the risks of contracting malaria, the need to take chemoprophylaxis measures as prescribed to mitigate the risk of contracting malaria while working in Nigeria, the need to seek medical attention if one became ill after returning home and the importance of advising the treating physician of the patient's travel history. Haskins and the other crew members were advised that chemoprophylaxis had to be taken for at least one week prior to arrival in Nigeria, every day while in Nigeria and for one week upon leaving Nigeria and returning home. OSV made available malarone a chemoprophylaxis for malaria for use by its crew members. The crew

3

members could procure this drug free of charge from either the company office, stateside or in Nigeria, or from the captain of their assigned vessel, and were expected to take it as prescribed. Haskins routinely worked two to four months in Nigeria, returned home for a month, and then resumed work in Nigeria.

(5)

From May of 2005 until he last returned home in December 2006 Haskins worked off the coast of Nigeria on various supply vessels owned and operated by OSV including his last vessel the C-Retriever. Ex. J. Haskins lived in Raeford, North Carolina and, except for his first trip, traveled to and from Nigeria by airplane. While in Nigeria Haskins remained under the exclusive care and employ of OSV and spent virtually all of his time at sea in active vessel service as an engineer.

(6)

On the morning of Monday, December 4, 2006 Haskins concluded his hitch on the C-Retriever and disembarked at Onne Port, Nigeria. There is no evidence to indicate that a post-hitch debriefing took place advising of the importance of taking medication as prescribed or the type of information to communicate to a treating physician if taken ill after leaving the vessel.

(7)

After disembarking in Onne, Haskins traveled by OSV vehicle to Port Harcourt, Nigeria where he boarded an airplane for a flight to Lagos, Nigeria. 4/5/10 Falgout Dep. at 31:11 -32:11. Haskins was accompanied on this flight by Albert Falgout, the manager of OSV's Nigerian operations. *Id.* According to Falgout, Haskins did not appear sick and Haskins did not complain to him that he did not feel well. *Id*. at 34:10-35:11. Once in Lagos, Haskins boarded a

4

flight to Paris, France where he eventually caught another connecting flight home.

(8)

On Tuesday, December 5, 2006 Haskins reached his home in Raeford, North Carolina. He arrived home early for the birth of his grandaughter and upon his arrival he acted and appeared normal. Haskins, thereafter, developed a slight fever. Haskins' fever continued to worsen and his wife, Sarah Haskins, made an appointment for him at the Raeford Family Care Center in Raeford, North Carolina.

(9)

On Friday, December 8, 2006 Haskins saw an osteopath, Dr. Jennifer Horn at the Raeford Family Care Center. Haskins gave a general history of fever for the past several days on and off, darker urine, and a "knot in the scrotal area". Ex. X-3. Dr. Horn's chart records that Haskins' employment was "Nigeria, engineer". *Id.* When asked "Is it fair to assume that he told you that he had been in Nigeria some time in the recent past" Dr. Horn said "Probably fair, yes" 3/9/10 Horn Dep. at 32:17-25. At this time Haskins had a temperature of 103.3, his blood pressure was elevated, but the remainder of his physical examination was essentially normal. Ex. X-3. Dr. Horn obtained a urinalysis that showed elevated protein levels suggestive of a urinary tract infection. When asked about any medications being taken, Haskins made no mention of malarone or any other chemoprophylaxis for malaria. Dr. Horn prescribed an antibiotic and administered an injection of another antibiotic. Dr. Horn scheduled Haskins to return to the clinic the following Monday and also provided a general cautionary instruction to Haskins that he should go the emergency room if his symptoms worsened. 3/9/10 Horn Dep. at 29:8 - 30:25. Haskins returned home and later that evening, after taking Tylenol, his fever

dropped to about 99.

(10)

On Saturday, December 9, 2006, Haskins' fever rose to approximately 104 and his wife took him to the emergency room at the Womack Army Medical center. Haskins provided a history to the triage nurse that he had a fever for five days that had risen to approximately 104 and had been evaluated and treated by his physician for urinary tract infection the previous day. Ex. Y. At the time he was seen in the emergency room Haskins' temperature had dropped significantly to 100.2, his blood pressure was normal (116/79), and his vital signs were otherwise unremarkable. Physical examination revealed an inflamed pharynx (sore throat), inflamed tympanic membrane (ear), and a cough. Malarone is not listed in the chart as a medication that Haskins was taking at the time although other medications which he was taking for hypertension and urinary infection were mentioned. *Id.* Haskins was diagnosed with pharyngitis and bronchitis, and prescribed an antibiotic (Biaxin), a cough suppressant (Tessalon), a ronchokilator (Albuterol), and Tylenol. Haskins was discharged with instructions to return to his primary care physician as needed. *Id.*

(11)

On Monday, December 11, 2006 Haskins returned to Dr. Jennifer Horn. Haskins no longer had fever, but had complaints of fatigue, coughing, vomiting, and appetite loss. Haskins was lucid, ambulatory, responsive, but he generally appeared ill to Dr. Horn. Blood laboratory results taken on Friday revealed liver abnormalities, and Dr. Horn instructed Haskins to go to the emergency room immediately for further work-up. On this visit Dr. Horn charted a history of Haskins recent return from Nigeria. Ex. 9a. Although she did not chart malaria as a possible

6

cause of Haskins' illness, Dr Horn testified she considered malaria within her differential diagnoses. Dr. Horn also testified that at the time she treated Haskins she knew that Nigeria was a malaria endemic area. 3/9/10 Horn Dep. at 63:1 - 64:1.

(12)

Haskins went immediately to the emergency room at Cape Fear Valley Medical Center. Haskins was evaluated by Dr. Elizabeth Jewell in the emergency room. Dr. Jewell performed a number of diagnostic and laboratory tests, including a CBC that revealed malarial parasites. Ex. Z. There are four main types of Malaria that cause disease in humans: Falciparum, Vivax, Ovale and Malariae. 3/26/10 Miller Dep. at 16:10-12. All are Plasmodium. *Id.* at 12-13. That is, they all involve parasites found in the red blood corpuscles. Plasmodium Falciparum is the most severe type and it is found in Nigeria. Haskins was diagnosed with Plasmodium Falciparum malaria. He was extremely sick and was administered immediate intravenous quinidine gluconate and doxycycline and admitted to the intensive care unit for further care and management. Haskins continued to experience labored breathing, accelerated heart rate and abdominal pain. Ex. Z. Because of his deteriorating condition Haskins was transported by helicopter to the University of North Carolina Hospitals in Chapel Hill, North Carolina (UNC).

(13)

Upon admission to UNC Haskins was found to be hypoxic and profoundly acidotic. Ex. AA-47. The parasitic load or count was extremely high. It was approximately 30% (5% is worrisome and 10% is usually considered extreme). His physicians initiated an aggressive red blood cell exchange transfusion. 3/26/10 Miller Dep. at 56:24 - 57:1. Although the interventional treatment reduced the parasitic load relatively quickly, Haskins' extreme acidosis

7

and related co-morbidities resulted in profound and continued deterioration with no clinical improvement. *Id.* at 59:1 - 60:6. While at UNC Haskins remained surrounded by his wife their pastor and other family. Haskins had at least one lucid interval where he opened his eyes, squeezed hid wife's hand and attempted to speak. Shortly thereafter, Haskins suffered a seizure and his condition deteriorated. Haskins died on Wednesday December 13, 2006 at the age of 45. His death was a direct result of severe Plasmodium Falciparum malaria that he contracted during his most recent employment hitch in Nigeria.

(14)

Haskins' funeral was held at Buie Funeral Home in North Carolina at a cost of $3,120.50. The following medical expenses were incurred:

| | |
|---|---|
| Raeford Family Care Center | $665.00 |
| Cape Fear Valley Medical Center | $15,976.00 |
| University of North Carolina Hospitals | $34, 537.03 |
| Air Ambulance | $8,598.00 |
| UNC Physician and Associates | $3,271.00 |
| Total | $63,047.03 |

Haskins earned $103, 941.35 in 2006 as a vessel engineer for OSV. He had a work life expectancy of approximately 13.46 years.

## III. CONCLUSIONS OF LAW

(1)

This Court has jurisdiction over this matter under 28 U.S.C. § 1331(1), the Jones Act, 46 U.S.C. § 30104 (formerly §688) and Rule 9 (h) of the Federal Rules of Civil Procedure. Venue is proper because the Defendant is subject to the personal jurisdiction of this Court.

(2)

At all times relevant hereto Hawkins was employed by the defendant as a seaman or member of the crew of its vessels including the C-Retriever. A seaman is entitled to recover under the Jones Act when his employer's negligence is the cause, in whole or part, of his injury or death. *Gautreaux v. Scurlock Marine, Inc.*, 107 F. 3d 331 (5th Cir. 1997). An employer has the duty to provide its seaman employees with a reasonably safe place to work, including providing suitable gear and equipment. *Colburn v. Bunge Towing, Inc.*, 883 F. 2d 372 (5th Cir. 1989). A cause of action under the Jones Act arises when this duty is breached and the employer's breach is the legal cause of the seaman's injury or death. *Gavagan v. United States*, 955 F. 2d 1016 (5th Cir. 1992). The standard of care is reasonable care under the circumstances. This standard applies to both the employer and the seaman employee. *Gautreaux*, 107 F. 3d at 338.

(3)

A seaman also has a claim against the vessel and its owner if his injury was a proximate cause of the vessel's unseaworthiness. To establish a claim for unseaworthiness, the injured seaman must prove that the owner failed to provide a vessel, including her equipment and crew, which is reasonably fit for its intended purpose. *Boudreaux v. United States*, 280 F. 3d 461 (5th

Cir. 2002). The duty of the vessel owner to supply a seaworthy vessel is an absolute non-delegable duty. To recover damages from an unseaworthy condition the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.

(4)

In the present case the Plaintiff, Sarah Haskins, failed to sustain the burden of proving that Michael Hawkin's injury and resulting death was caused either by the negligence of the defendant, OSV or by the unseaworthiness of any of its vessels including the C-Retriever. The credible evidence reveals that Haskins was given adequate instruction and provided with chemoprophylaxis medication. He was alerted to the presence of malaria in Nigeria and given instruction regarding precautions to minimize the risk of infection. He was given malarone, a recognized chemoprophylaxis and instructed on its use. Hawkins was advised of the need to continue taking the medication for at least one week after leaving Nigeria and returning home. (However, there is no evidence to indicate that he continued to take the medication after he left Nigeria. None of the charts from the North Carolina health care providers list malarone as one of the medicines that Haskins was taking. These lacunae suggest that Haskins failed to follow the instructions regarding the need to continue his medication following discharge.) Haskins was also told that if he developed fever or fatigue upon returning home to immediately go to a doctor and inform the doctor of his symptoms and his recent travel history. The credible

10

evidence supports the conclusion that Haskins followed these instructions. When Haskins returned home and developed fever, he immediately went to his doctor, advised the doctor of his symptoms and stated that he worked as an engineer in Nigeria.

The Plaintiff argues that Haskins did not state during his first doctor's visit that he had just returned from Nigeria because he didn't know this was necessary. This argument rings hollow because a reference to Nigeria appears in the doctor's chart which recorded the history the doctor took from Haskins during his first visit. If his return from Nigeria was remote in time or was irrelevant, it is logical to conclude that no reference to Nigeria would have appeared in the chart. Thus the Court concludes that the evidence supports the conclusion that Haskins did indicate that he had just returned from Nigeria during his first doctor's visit.

The Plaintiff next argues that the defendant was negligent in failing to instruct Haskins to tell his doctor that he had recently returned from a " malaria endemic area" and not just that he had returned from Nigeria. The problem with this argument, in this case, is that Dr. Horn, Hawkins' physician, testified that she knew that Nigeria was a malaria endemic area so it was not necessary to tell her. 3/9/10 Horn Dep. at 24:14 - 25:2. Neither side in this litigation claims that any of the health care providers in North Carolina deviated from the standard of care. In fact there is no evidence to suggest any deviation so this is not an issue in this case.

**IV. CONCLUSION**

Considering the above findings of fact and conclusions of law, the Court finds that the Plaintiff has failed to prove beyond a preponderance of the evidence that the decedent's death was caused by the negligence of the Defendant or the unseaworthiness of any of the Defendant's

vessels. Accordingly, this Court enters judgment in favor of the Defendant.[1]

New Orleans, Louisiana, this 8th day of June, 2010.

                                                                                                                                _____
                                                                                                                                United States District Judge

---

[1] Haskins was injured in the course and scope of his employment, and may have been entitled to maintenance and cure. While Plaintiff's complaint seeks damages for medical expenses, no claim for maintenance and cure was made at the time of trial. There is no evidence in the record to indicate who paid Plaintiff's medical bills and the Court makes no findings as to what outstanding obligations, if any, Defendant has as to maintenance and cure.